CÁNDIDO FERNÁNDEZ, Plaintiff and Appellant, v. ISIDORO ALVAREZ, Defendant and Appellee.

No. 5571. Argued December 1, 1931.—Decided November 25, 1932.

C. *Coll y Cuchí* and *Luis R. Polo* for appellant. *Henri Brown* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

Plaintiff sued defendant for the sum of $46,000 and the lower court held the claim not only groundless but malicious. Plaintiff appealed, assigning in his brief four errors, all of which deal with the admissibility and weight of the evidence.

The complaint, insofar as we deem it pertinent to transcribe it, reads literally as follows:

"2.—That on March 23, 1929, plaintiff consented to pay, and did pay to Benigno Díaz, for the account of the defendant, the sum of

forty-six thousand dollars ($46,000) owed by said defendant to said Benigno Díaz, the payment having been made with the knowledge and consent of the said defendant and for the purpose of satisfying the aforesaid debt existing between said defendant and said Benigno Díaz, and said Benigno Díaz having received to his satisfaction, for the account and at the request of said defendant, the said sum of forty-six thousand dollars in United States currency.

"3.—That defendant bound and obligated himself with plaintiff to repay the said sum on May 31, 1929, without any interest whatever.

"4.—That defendant has not repaid to plaintiff the said sum, nor any part thereof, in spite of having been required so to do in accordance with his obligation, on and after May 31, 1929."

Defendant demurred to the complaint, and answered denying specially all of its essential facts. The case went to trial. Both parties introduced oral, documentary, and expert evidence. Upon examination of the evidence, the trial court arrived at the following conclusions:

"1.—That plaintiff has not proved counts 2, 3, and 4 of the amended complaint.

"2.—That the instrument marked plaintiff's exhibit 'B', which is the basis of this action, is a forged document.

"3.—That in the month of March, 1929, and prior to March 23, the defendant Isidoro Alvarez was not owing Benigno Díaz the sum of $46,000 claimed, or any other sum of money, and

"4.—That the claim made by plaintiff Cándido Fernández against defendant Isidoro Alvarez is malicious and unjust, and that in this action plaintiff has attempted to perpetrate a fraud upon defendant."

For the proper decision of all the questions involved, we find it necessary to summarize the evidence.

The first witness for the plaintiff was the plaintiff himself, Cándido Fernández, of age, married, domiciled in Hato Rey, Río Piedras, and a resident of the Island for 19 years. He knew Benigno Díaz, a business man of Caguas, visited him frequently. Late in March, 1929, Díaz went to see him and told him: "That he needed money; that there was a gentleman in Caguas who owed him a sum which he had advanced at different times for investment in accordance with the instructions which the two of them had agreed upon, . . .

That now he needed to have this person return this sum, and accordingly he called him, and that this person told him that he would have to give him time to obtain it for him . . . He asked me whether I had money, and I told him that I had, that just at that time I was liquidating everything I had in order to leave for Spain, and he told me that he needed $45,000, that he would give me a document for $46,000 from the person who owed him that sum, and I asked him about his position and situation, and then he took out a notebook and asked me for some paper, and he made out this statement, and besides, he said, the person who is going to give you the document is much more responsible than I am.''

Said statement was offered in evidence and admitted over defendant's objection. It was marked with the letter ''A''. It does not appear in the transcript of the evidence.

The witness continued to testify:

''In view of this conversation, and of this statement presented to you by Mr. Díaz as to his financial position, what did you agree upon? —He told me, further, that he would keep this money for one month only, and that I would do him a great favor if I advanced it to him. I had no objection; I knew him and knew that he was an honorable person and I told him that if it was only for a month, I would give him the $45,000; I told him to bring me that document, and that he could come for the money when he wished . . . The next day, I lay down for a while after lunch, then arose and came to San Juan, I had to see Attorney Agosto, and when I went by the corner of Fortaleza and San Justo someone called me: I looked and saw it was Don Benigno . . . I stopped, he approached my car and told me that he was coming for that money, and that he had the document with him. Then I told him to get in my car, since he told me that his car was down by the Marina, we went home and he sat down in the dining room . . . I offered him a satchel to carry the money, he put it in the satchel, then we both left for San Juan in my car and I left him in front of the Municipal Theater . . . I gave him three packages of hundred-dollar bills, eight packages of fives, I believe ten packages of tens, and fifty twenty-dollar gold coins.''

When asked by his attorney: ''When you delivered this money to him and he placed it in the satchel you have men-

tioned, what did Mr. Díaz deliver to you?'', he answered: ''The document''. And upon being shown a document: ''That was the very one.''

Plaintiff, by his attorney, offered ''the document'' in evidence. Defendant objected on the ground that its authenticity had not been established, and the court admitted the writting and stated that it did so bearing in mind the defendant's objection. The latter took an exception. The document, copied literally from the original which was sent up with the transcript, states:

''Caguas, P. R., March 23, 1929.—Mr. Benigno Díaz, Caguas, P. R. —Dear Benigno:—Not being in a position, as I told you before, to disburse the $46,000 (FORTY-SIX THOUSAND DOLLARS) that I owe you, and desiring to be as useful to you as possible at this time which is so decisive for you, since you have found a friend who will advance you this sum with my signature, I am happy to make out below the document of which you sent me copy, having changed only the date of maturity, since it is impossible for me to attend properly to such an obligation until the end of May of the current year.

''Since I have contracted this obligation, I would appreciate your sending me with the bearer a receipt in full payment of all our accounts.

''Received from Mr. Cándido Fernández, through Mr. Benigno Díaz, the sum of $46,000 (FORTY-SIX THOUSAND DOLLARS) by way of deposit, and without interest, which sum I shall repay on March 31, 1929 (ONE THOUSAND NINE HUNDRED AND TWENTY-NINE), upon presentation of this document, or to his order and at his residence.''

It is difficult for one who is not familiar with the signature to make it out. In the transcript it is copied as follows: ''Sgd. Isidoro Alvarez.''

The witness went on to testify that a few days after the delivery of the document, Benigno Díaz committed suicide. Fifteen days before its maturity, he wrote to Alvarez and received the following reply by wire:

''Since I owe nothing, I have signed no document for Mr. Díaz.''

The letter addressed by the witness to Alvarez, later introduced in evidence by the latter, states:

"Permit me to remind you, for your guidance, that the document which I hold, executed and signed by you in payment of what you owed Mr. Benigno Díaz, matures on the 31st of this current month."

Answering questions by counsel for the defendant, plaintiff said:

"I was engaged in the manufacture of liquor before prohibition, and since then at various times I have owned a perfumery and a plant for the production of bay rum . . . At the same place where I had my liquor plant, I set up a bay rum plant after prohibition; then I set up another and shut it down, or rather the government shut it down . . . alleging that I was making improper use of the alcohol and that I had adulterated formulae, and so forth, and then I set up another plant in the name of . . . and that was shut down too because I was making improper use of the alcohol, then I set it up in the name of José Pilar Ramos, at Loíza Street, and then I continued to produce non-alcoholic beverages, and I am still doing it."

He knew Benigno Díaz well, and on another occasion loaned him $16,000 which was punctually repaid. He knew Isidoro Álvarez by sight, but had never met him or done business with him. Díaz proposed the transaction on March 22. When he was delivering the money to Díaz on the 23d, Aurelio Miró arrived at his home, and he told him to return the following day. After explaining that he had sold a house and collected a note, and had other dealings, he said:

"After they shut down my last perfumery I continued to produce non-alcoholic beverages and I can assert that I have made more than $30,000 in that business . . . In the three years I made more than $50,000 . . . I have had days when I have made $10,000 . . . On a day when they would bring me ten drums of alcohol I would make ten thousand dollars . . . That was when I had the perfumery which was later shut down because they claimed that I made improper use of the alcohol."

In spite of having made so much money he never paid an income tax. He had the money at home, "in a place I made expressly for hiding it." Referring to Díaz he said:

"He was a man after my own manner of acting and thinking."

He did not know Alvarez's signature. The fact that Díaz had delivered the document to him was sufficient to assure him that it was good. Although the document speaks of $46,000, he delivered $45,000, for they were giving him $1,000 "for the month that they were to keep that money." Díaz gave no other security. He learned that Díaz was in a bad situation, but this was after his death.

It was not true he had gone to Notary Soto Rivera to ask the latter to authenticate the signature by stating that Alvarez had signed in his presence. The document in favor of the partner of Jiménez García was made in the name of Félix Torres. The document was already made out, and he negotiated it to Torres. He had some litigation on account of a pianola for which he paid and they attempted to collect twice; "they sued me, I showed the court the receipt in full payment and they decided the case in my favor."

The second witness to testify was Carmen Camacho, from Caguas, industrialist, who knows defendant Alvarez and knew Benigno Díaz who lived in the ward of Turabo. Late in March Alvarez made use of his services to send a sealed envelope to Díaz. He delivered it and Díaz gave him an usealed envelope for Alvarez. He saw the contents of the envelope and it was a receipt. "The receipt stated 'I have received from Mr. Isidoro Alvarez the sum of $46,000 in full payment of all our accounts.'" He delivered the receipt personally to Alvarez. He found Alvarez in Caguas, on the street, about eleven o'clock, and went with him to his home, where he delivered the letter, which was already written. He left, took a bus and stopped at Díaz's home. When he delivered the letter to Díaz, the latter asked him "Are you returning to town?" and he answered "Yes, sir, later," and he gave him the receipt. On being cross-examined with respect to the contents of the receipt, he again answered: "I have received from Mr. Isidoro Alvarez the sum of $46,000 in full payment of all our accounts." It was the first and only time that Don Isidoro made use of his services. He

paid him nothing. Both Alvarez and Díaz were alone. He said nothing about the incident to his friends. When asked if this was so, why had he come to testify, he answered: ''Because some days after the death of Don Benigno it was being said that he had died for want of money, they were discussing that there, and one day I was in front of the store located in the building where he lived, and several persons were discussing the death of Don Benigno, and I was saying that it could not have been for want of money, because I had delivered to Mr. Isidoro Alvarez a receipt for $46,000 and I believed that he had received money about that time . . . And there were some cars in front of the store and that gentleman . . . ''—Judge: ''What gentleman?'' The witness pointed at the plaintiff and continued: ''He got out of the car, came to me, called me, naturally I was surprised for I did not know him, and he said to me 'Will you do me the favor of coming and testifying for me; I am interested in finding someone who will clear up this matter, because I have some money tied up in this'; and I told him that I had no objection, but that I would have to go home first before going with him, and then he took me home . . . '' ''When was that?'', asked counsel for defendant, and the witness stated that this occurred about a month after the death of Benigno Díaz, more or less. Plaintiff paid the witness nothing for testifying, either then or now. He knows Félix Torres of Caguas. ''He is neither a friend nor an enemy; he is an acquaintance.''

Camacho was followed by the witness Aurelio Miró. Fernández had loaned him money on several occasions, and in March he went to the home of Fernández and found him at the dining room table with another gentleman whom he did not know. ''They were counting money. Bills, I saw them. Plenty of them.'' Fernández told him to call some other day, because he was very busy with some business and had to go out. He recalls ''that each of them had a pencil in his hand, and there was a satchel between them and around the satchel some packages of money.''

Aurelio Vélez, another witness for plaintiff, knew Benigno Díaz; was somewhat friendly with him; recalls having seen him in Caguas early in April and having spoken to him. To the question, "And did he tell you he was coming to San Juan?" he replied: "He walked up to the square, where I was, about to start for San Juan, and he asked me whether I knew Cándido Fernández and I said I did not know him, but if he needed me I would be glad to serve him, and he showed me a bag he was holding and told me to stop at the Martín Peña station in Hato Rey and to tell Don Cándido that there were three bills missing from the hundred-dollar packages, that he would settle the matter with him when he went to San Juan . . . I came, got down at Hato Rey and inquired from a gentleman, who was there, about Don Cándido's residence; he showed it to me, then I went in by the back door and called, and Don Cándido Fernández came to the door, I delivered the satchel and gave him the message; it was one of those black satchels used by salesmen."

Blas Delgado testified that he knew Benigno Díaz. He had a car which Don Benigno used for his trips. Late in March they left Caguas one morning for San Juan. He brought no baggage. He left the car in front of Alonso Riera, in San Juan. "When I came about three o'clock more or less, he was waiting for me in the car, and there was a bag in the car."

Then followed the evidence of hand-writing experts, with which plaintiff closed his case. The experts were Félix Vega Nevares and Pedro C. Timothée. Referring to "the document," the former stated: "That the unquestionable document is absolutely authentic and undefiled by forgery or adulteration"; and the latter testified: "Studying this carefully, I found, comparing these signatures, I found that not only was there no forgery in this case, but that it was practically impossible that there could be a forgery, due to the special and characteristic quality of the writing."

Defendant opened his case with the testimony of witness

José Vercher, manager and cashier of the Caguas Branch of the Banco Territorial y Agrícola. He knew Benigno Díaz. He had business with his bank. In March he owed the bank money. Díaz himself dictated to him a statement of his financial condition in which there was no mention of any credit whatever against Isidoro Alvarez. The situation of Díaz was very difficult. "The bank wished to collect the indebtedness and he could not work the matter out. He himself attempted to obtain a loan, and applied to me, to the Royal Bank of Canada, and to the Banco de Ponce . . . And he did not get it."

A copy of the statement of Díaz's current account with the bank, which the witness identified, was introduced in evidence. On March 23, there was an overdraft of $19,000. At the close of the month the overdraft mounted to $39,809.65. The total indebtedness of Díaz to the bank was even larger. The Díaz account arose out of "some drafts which this gentleman discounted, drawn on the firm of Madera Tobacco, of New York; the bank believed they were secured by shipments of tobacco, but it turned out this was not so."

Ernesto Fernando Schlüter, then manager of Schlüter and Co. and president of the Banco Industrial, testified that he knew Díaz since 1918, that he was his agent in Caguas and an important fertilizer client. In March, 1929, he asked the witness for a loan of $30,000. He could not make the loan, and he went with him to other banks, also without success. He knows that Díaz needed that money to pay some drafts that he had discounted with the Banco Territorial and which fell due from March 15 to March 31. The financial statement which was presented to him did not include any credit whatever against Alvarez. The witness brought with him the ledger sheet showing Díaz' current account with the Banco Industrial. On March 23, 1929, there was a deposit of $2,630.30, made by Blas Delgado, consisting of two checks, and on the same day the bank paid a check for $2,000 drawn by Díaz. The deposits were taken to the bank by Blas Del-

gado. At the closing of the Díaz account in April there was a balance in his favor of $562.68, which was turned over to a marshal by reason of an attachment. The witness testified also with respect to the good reputation of Alvarez.

José Madera, another witness for defendant, testified that on March 23, he saw Díaz in Quebradillas, Caguas. He went to collect a draft which had matured, and was paid by a check drawn against the Banco Territorial, which he deposited with the Royal Bank of Canada. He saw him about ten or ten-thirty o'clock in the morning.

Antonio Longo and Cipriano Manrique testified with respect to the critical situation of Benigno Díaz and the efforts they had made to help him, on condition that Díaz set aside the transfers of assets which he had made and restore them to the common fund. Both witnesses, in referring to the reputation of Alvarez, characterized it as excellent and unassailable.

Alberto F. Balzac, then manager of the Caguas Branch of the American Colonial Bank, stated that Díaz went to see him in March to request a loan of $30,000, that he asked him for a financial statement, that he did not send him one, and for this reason he wrote to San Juan so that they would not consider the transaction. He knows Isidoro Alvarez, and states that he enjoys a "very good reputation and also good credit."

Horace Grindell, sub-manager of the Royal Bank of Canada in San Juan, knew Benigno Díaz, who visited the bank in March, 1929, to request a loan of $30,000, and presented a financial statement which did not show any debt due from Isidoro Alvarez. On cross-examination, he was asked when a check, drawn on a Caguas bank and deposited with his own bank at one o'clock p. m., is sent to Caguas, and he replied: "It is sent by mail the same day."

Félix Aróstegui, manager of Durlach Bros., knew Benigno Díaz and Isidoro Alvarez. When the latter left for Spain in 1928 he acted as his attorney in fact. Asked, "And what

was the business of Mr. Alvarez at the time?", he replied: "At that time he left some tobacco to be liquidated, and it was liquidated by Mr. Antonio Longo and the money was delivered to the 'Territorial'. Mr. Alvarez left in each envelope the details of the money borrowed by each farmer from him, and the amount of tobacco left in the Colectiva warehouse which was the one he liquidated for the farmers financed by Mr. Isidoro Alvarez, and although said farmers had agreed to accept in payment for their tobacco one dollar less than the price paid by the Colectiva, as attorney in fact I ordered Don Benigno to pay at the same price as the Colectiva, which was 24 cents; then Don Benigno would make out his own check in favor of those farmers as had a balance in their favor, and on Saturday Blas Delgado would come to me with a list of the checks which he had issued, and I would then give him Don Isidoro's check for the amounts which had been paid by him . . . Afterwards, when Mr. Alvarez returned from Spain he settled with those farmers who had not a favorable balance. The others came to settle with Don Benigno. On August 4, I handed him a check for $248.78 against the Caguas branch of the Banco Territorial y Agrícola, and on August 18, I handed him another for $37.96. These two amounts covered what Benigno Díaz had paid to several farmers financed by Isidoro Alvarez.—Q. Did you know of any other sum owed by Mr. Isidoro Alvarez to Benigno Díaz?—A. No, sir, because when Don Isidoro left for Spain he left me a list of the amounts and persons to whom I had to make payments.—Q. Was Mr. Benigno Díaz in that list?—A. No, sir."

The defendant himself then took the stand. He said he had been a merchant in Caguas until he sailed for Spain in 1928. He had known Benigno Díaz, who had also been a merchant and later engaged in the purchase and sale of tobacco and crop financing. In addition to his business the witness occasionally lent money. Shortly before he sailed he had lent about $25,000 with mortgage security. He also

financed crops on a small scale. He had no business with Don Benigno. He dealt with him only in occasional purchases of fertilized. When asked, ''Have you owed Benigno Díaz money on any other account?'', he replied: ''Never, never. How was he to lend me money when for three or four years he had been operating under difficulties in his credit and in everything?'' Asked again, ''Is it true that in March of 1929 you owed Benigno Díaz $46,000,'' he answered: ''I have never owed him or anyone such an amount. In the many years that I have been a merchant, I never borrowed such a sum, because my business is on a small scale and does not permit it.''

He explained that his assets consisted in urban and rural real estate and mortgage credits, and that he paid property taxes to the treasury of Puerto Rico on an assessed valuation of over $100,000. In March, 1929, he kept his current account with the Banco Territorial, with a favorable balance. He had no debts.

Referring to the testimony of plaintiff's witness, Camacho, he stated that it was not true that he had handed him any letter for Díaz, nor was there any reason for it, ''since I would see Don Benigno passing by my house three or four times a day, for he lived in town, and came to lunch, and after having lunch he would leave for the country. Many were the days when we saw each other three or four times during the day. He came to lunch at his home in town, and he had to go by my house.''

In connection with the document he testified:

''It was never in my possession; I have never seen it nor known of it until the day that it was taken to your office. It was the first time I saw it, but it had never been in my hands.''

He stated that the signature at its foot was not his. He does not know how to operate a typewriter and does not own a typewriter. When he finds it necessary to write a letter to

a person of importance he goes to the Banco Territorial and one of their employees prepares it.

Then came the following examination, which we copy literally:

"Q. Have you ever signed a letter at the request of another? —A. Yes, sir. —Q. Many times or . . . —A. Several, but the last one was quite some time ago that I signed it. —Q. What kind of a letter was that? —A. One day, on my way from my home to the square, when I arrived there and in the middle of the square, I suddenly came up against a gentleman there by the name of Félix Torres who tells me: 'Say, I have to undergo an operation in the Auxilio Mutuo, and I have only $100; I wish you would give me a letter of recommendation, or sign this letter of recommendation to see if I can get them to do it for this amount.' And then I refused to sign it because I was not the Caguas representative of the Auxilio Mutuo, Celedonio Pérez being such representative; then I told him that I could get Celedonio Pérez to sign the letter for him, and he replied no, that he wanted my signature, and then I signed the letter, in ink of a special color, written by hand on typewriting paper. —Q. Was the letter written by hand? —A. In his handwriting, or that of someone else, as it was not typewritten. —Judge. Q. What you are saying is that the letter presented to you for signature was on typewriting paper and handwritten? —A. Yes, sir, handwritten, in ink of a special color. Defendant. Q. And where was that letter signed? —A. That letter was signed in the small café which was run by El Chévere, back of the Banco Territorial. It was one of the Chéveres; it was a small café the Chéveres had there. —Q. There have testified here Carmen Camacho; Aurelio Vélez . . . . A. Well, it's that Vélez, alias Chévere; it is the same one they have in Caguas; they had a small three-door café back of the Banco Agrícola. —Q. And was it there that you signed the letter at the request of Félix Torres? —A. Yes, sir. —Q. And how is it that you remember that letter? —A. I remember that because that was early in July or late in June of 1926, a date I shall remember as long as I live, and shortly after that someone tried to collect a document in Caguas, and there was a great deal of talk, and that is why I remember the date, because I made a note of it. —Q. Who was concerned with that document? —Plaintiff: I object to any other document except the document involved in this action."

When asked: "Have you ever seen or spoken with the plaintiff in this case?", he answered:

"I have never met him; I have never seen him, nor have I ever spoken to him or to any of the four or five attorneys who have represented him."

He received the letter of May 15 on the following day and he answered it. He has not received any other communication.

So much for the direct examination. The cross-examination of the witness was lengthy, and he maintained throughout the stand he had taken.

The testimony of expert chemist Rafael del Valle Sárraga takes up some fifty pages of the transcript. He said, in short, that the methods used in forging signatures and documents were:

1. To superimpose a writing on a blank sheet of paper in such manner as to expose a part of the blank sheet where the signature is to be placed.

2. Eradicating all or part of a writing over an authentic signature, and substituting in the space occupied by the deleted writing whatever the forger may desire.

3. Tracing the signature.

4. Making a facsimile of an authentic signature.

When the signature is obtained by superimposing a written sheet over a blank sheet of paper, this is often done in such a way that no trace remains to indicate that this method has been used. In the majority of these cases the forger attains his end.

When the writing over a signature is made to disappear by the use of chemical reagents, if the writing was done in ink based on iron or logwood extract, the obliterated letters may be made to reappear by the use of gases such as hydrogen sulphide. But when the ink used in the deleted writing is based on nigrosine or any other aniline color, it would be impossible to obtain later the faintest trace of the writing formerly appearing on the document.

An engraved signature is rather perfect, while a traced signature, under the microscope, reveals the characteristics of a toothless saw; as if the hand that wrote it had trembled; but the other type of forgery, obtained by means of metal engravings, may show such a great resemblance at times that even under the microscope it is difficult to distinguish the signature so made from that written by the person who is supposed to have written it.

Lastly we shall refer to what occurred as a result of the testimony of Attorney and Notary José Soto Rivera. Asked: "Do you recall an occasion, a conversation with Cándido Fernández last year, some time after April of last year, with respect to the authentication of the signature of Isidoro Alvarez on a document which he brought with him?", he replied: "Mr. Cándido Fernández—I can not fix the date exactly because he came to my office often and I handle many of his affairs—consulted me with respect to a document, but that was a matter between attorney and client, and I do not feel free to testify here as to what we discussed, what he consulted with me."

There was some argument as to whether the witness was bound to answer, and after the court decided that he was, he answered: "That it had been presented to me by Mr. Fernández, who requested my advice as to whether it might be possible to authenticate that signature. Then I told him that the only way to authenticate it was to bring the person who signed it, and have him acknowledge that that was his signature, and then it could be made to appear on the document that this person acknowledged that it was his signature."

The examination continued as follows:

Q. Do you recall the conversation you had with me a couple of days ago? —A. A purely private conversation in which I advised you that neither you nor I could make any use of what I had spoken with you. —Q. Do you recall having talked about the same matter with Attorney González, of my office, a week ago? —A. Not only with Attorney González, but also with Attorney Ruiz Nazario, and to all

three I made the same observation. —Q. Is it not true that you stated to Messrs. González, Ruiz Nazario and to me that Cándido Fernández had requested you, as notary, to authenticate the signature of Isidoro Alvarez on the document I have just shown you, offering you a considerable sum of money if you did so, and that you refused to do so? A. I believe I should not answer that question, because the conversation had by me with attorneys Brown, González, and Ruiz Nazario was absolutely confidential, and I advised them beforehand that they could make no use in court of whatever I told them about this matter, for I would refuse to testify as to that. —Judge: Is there anything in the law to protect you on this point? Witness: I appeal in the first place to the code of honor and nobility. —Judge: You were asked for authority to be found in legal codes. —Witness: I know of no such authority, but at least I did make that admonition to them.—Defendant. Q. Did you state to me that this was private and confidential before making your statement? —A. Yes, sir, Mr. Brown, I told you not to call me as a witness in this affair because I did not wish to become involved in it; and I said the same thing to Mr. González and to Mr. Ruiz Nazario. —Q. And didn't I reply that no attorney had the right to conceal a crime; that it was his duty to reveal facts of this nature, if within his personal knowledge? —A. You did state that, but that is on the theory that you consider that a crime; it was something different . . . Q. What would you call a proposition to a notary to authenticate the signature of a person on a document which is dated some time back, offering the notary a considerable sum of money if he should do it? —Plaintiff: That is a hypothetical question and there is nothing in the record to support it. It has not been proved that this occurred; on the contrary, the witness has testified under oath that Mr. Fernández requested his professional advice as to whether it would be possible to authenticate the signature, and that he replied that it was impossible unless Mr. Alvarez should appear for the purpose, and that Mr. Fernández was content with this.—Defendant. Q. Then my question stands, and Mr. Soto Rivera has refused to answer it. —Judge: The court orders the witness to answer it. There is nothing in the law, nor has it been shown to the court that there is anything in the law, to prevent the witness from answering that question. —Plaintiff: the question tends to impeach the veracity of Mr. Brown's own witness; it could have been made for no other purpose, that is, to establish that the first answer made by the witness under oath was not true; under the circumstances Mr. Brown is authorized to do so, but he should announce to the court that he

is going to impeach the testimony of his own witness, who has turned out to be hostile, and that he is attempting to impeach his veracity. —Defendant: It is not for the purpose of impeaching his veracity, but of showing that on another occasion he made inconsistent statements. Section 156 of the Law of Evidence provides: (Reading) —Judge: The question is admitted in accordance with section 156 of the Law of Evidence. The witness will answer. Plaintiff: The question is immaterial unless it is for the purpose of impeaching the veracity of the witness.—Judge: The examination shows what the purpose of the question is, and taking the examination as a whole the question is proper under section 156 of the Law of Evidence. Plaintiff: If the court so considers it, very well. —A. Before answering the question, I wish to lay the foundation for my reply, your Honor, because I would not want it to be thought, or even doubted, that I could not keep secret any matter that might be brought to my office. I do not know from whom Mr. Ruiz Nazario learned that I knew of this document. He asked me and I told him . . . It is not my custom to conceal the truth. Later Mr. Brown and Mr. González spoke to me and I told them that Mr. Cándido Fernández had offered to pay me for the authentication of the signature, under such circumstances as the signature could be authenticated. —Q. What I don't understand is the part about the circumstances under which the signature could be authenticated. —A. The circumstances under which I told him that the signature might be authenticated, about which I have already testified. —Q. Did you say anything about the circumstances, or about a request for an opinion with respect to the circumstances under which the signature might be authenticated, to me, to González, or to Ruiz Nazario? —A. More or less in different words, but in that same sense. —Defendant: Nothing else. Plaintiff: Nothing, your Honor.''

Later, Attorney Brown testified as follows:

''My name is J. H. Brown; I am a resident of San Juan and counsel for defendant in this case. As a result of statements made by Messrs. Ruiz Nazario and Guillermo González, who are associated with me in my office, I deemed it necessary to speak to Attorney José Soto Rivera with a view to using him as a witness in this case, and this is a rather delicate matter, but since I had not seen him prior to the 24th of this month, the day before this trial commenced I went to his office in the Noa Building, and I waited in his waiting room, and he came out of his private office. And then I told him that Messrs. Ruiz Nazario and González had told me that he had stated

to them that the plaintiff in this case, Cándido Fernández, had come to his office a few days after the death of Benigno Díaz bringing with him a document bearing the signature of Isidoro Alvarez, wherein Isidoro Alvarez made a receipt for $46,000, paid by Cándido Fernández to Benigno Díaz, or delivered by Cándido Fernández to Benigno Díaz, and that Cándido Fernández had asked him to authenticate that signature, making it appear that the signature had been affixed to the document in his presence as notary. Mr. Soto Rivera replied that this was true, that Mr. Cándido Fernández had come to him with the document and had made this proposition; that he certify that the signature had been affixed to the document in his presence, and had also offered him a large or considerable sum of money if he should do this, and that he had rejected the proposition and had refused to do it.

"When I told him that I proposed to question Cándido Fernández along that line, and that in case he should deny those facts I would call him as a witness, he told me not to do that; that this was a matter of which he had spoken confidentially to Ruiz Nazario; that it might be interpreted as a revenge he was attempting against Cándido Fernández, because he was suing Cándido Fernández; and I told him that in compliance with my duty as attorney for this party, it was necessary to call him as a witness and that I was going to do it. That is all. Plantiff: Nothing, your Honor."

At the close of defendant's evidence, plaintiff, in rebuttal, put expert chemist Mr. Angel Pesquera on the stand. His testimony takes up 48 pages and is difficult to summarize. He had witnessed the experiments made by expert witness Del Valle. Among his assertions is the following: "My conclusion is as follows: that in the light of the tests to which this document has been submitted, by elimination I conclude that nothing was written on the face of this document prior to what is now written on it. I mean to say that from the tests made that does not appear." Referring to the anomaly observed on the "i" in the signature of Alvarez, he said that this was a "flow black," that is, that it was due to the ink's having spread. Regarding the entire signature he concluded "that the signature appearing on document 'two' was originally placed there by the hand of man, and that it was not

copied or transferred from another document by any mechanical means.''

Such was, in brief, the evidence which led the trial court to decide the case against the plaintiff.

We stated at the beginning of this opinion that all of the errors assigned as grounds for reversal of that judgment deal with the admissibility and weight of the evidence. The first point raised refers to the error of the district court in considering the testimony of Attorney Brown as evidence, when it should only have been considered for the purpose of impeaching the veracity of the testimony of Soto Rivera.

In its statement of the case and opinion the trial court expressed itself thus:

''Considering what we have copied above of the testimony given during the trial by attorneys J. H. Brown and José Soto Rivera, we can not but reach the conclusion that plaintiff Cándido Fernández attempted, by the offer of a large sum of money made by him to Notary Soto Rivera, to have the latter make it appear that the signature of Isidoro Álvarez had been affixed in the presence of said notary, Mr. Soto Rivera, and that the said notary refused to do this.''

Section 156 of the Law of Evidence provides:

''The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in section one hundred and fifty-nine.''

And section 159 prescribes:

''A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done, the statements must be related to him, with the circumstances of times, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them.''

This being so, there was no error in the admission of the

evidence, but there was error with respect to the weight of the testimony of Attorney Brown.

But is this reversible error? Not at all, in our judgment, since from a study of the statement of the case and opinion of the trial court as a whole it appears that, regardless of that evidence, the court arrived at its decision contrary to the claim of the plaintiff; and our own analysis of the evidence, discarding entirely the testimony of Soto Rivera and Brown, or rather taking into account Brown's testimony in order to discard that of Soto Rivera, leads us to the conclusion that the claim of the plaintiff is untenable.

In discussing the other errors assigned, appellant attributes passion, prejudice, and partiality to the trial judge. We do not agree. His conclusions and statements show, not prejudice, passion, or partiality, but the sincere and natural reaction of an honest conscience to the unfolding of the circumstances surrounding the case as revealed by the evidence. Perhaps the judge made unnecessary or improper observations, but this does not affect the validity of the conclusion at which he arrived.

The evidence clearly reveals the personal qualities of the three principal figures in the action: the plaintiff, the defendant, and Benigno Díaz.

From his own description, plaintiff appears to be a liquor producer whose plants are shut down several times by the government on the grounds of adulteration of formulae and improper use of the alcohol, who continues in the business, operating his plants in the name of other persons, who makes large sums of money, up to $10,000 in a day when they take him ten drums of alcohol, and who defrauds the People, concealing his profits for the purposes of payment of the income tax. There are some insinuations in the evidence with respect to a certain suit concerning a pianola—wherein a receipt presented by plaintiff played a decisive part—and with respect to the collection of a note negotiated to Félix Torres, of Caguas, which were never clearly

defined but which, when analyzed in connection with the rest of the evidence, serve to complete the picture of plaintiff's moral personality.

Benigno Díaz did not appear personally in court. He had died before the plaintiff addressed himself to defendant in the manner we have related. He began with a small business in Caguas, extended the scope of his business to the purchase and sale of tobacco and to crop financing, but his profits did not grow apace; on the contrary, his resources came to be so low that he overdrew his bank account in an amount close to $40,000. His friends came to his aid, on condition that he set aside a sham transfer of certain assets, but they could not obtain this. In March, 1929, he made efforts to obtain a loan of $30,000, without success, and in April his desperate financial condition drove him to suicide.

Defendant was also a merchant in Caguas on a small scale, and he extended the scope of his business, as did Díaz, but moving cautiously. In 1928 he liquidated his business and left for Spain, his native country. He returned in 1929. His assets appear on the books of the People of Puerto Rico for tax purposes, and his capital is invested in assets capable of identification. His reputation in the community is irreproachable; he had a favorable balance in his bank account in March, 1929, and his credit was solid.

Plaintiff and defendant testified under oath before the court, and their moral personality is of extraordinary importance in determining the credibility of their testimony.

The document on which plaintiff bases his claim was introduced in evidence while he was on the stand. We are familiar with it. It is a letter addressed to Díaz, at the foot of which appears a receipt for a deposit of $46,000. Plaintiff said it was signed by defendant because Díaz had told him so when he delivered it to him. When payment was demanded from defendant by plaintiff in the vague manner to which we have referred, he replied by telegraph that he had signed no document and that he owed nothing, and at the trial he maintained

this attitude. The burden of proof was, therefore, on the plaintiff with regard to the authenticity of the document and the truth of the transaction to which it refers.

The plaintiff did not see the defendant sign the document. He did not even know his signature. He had not spoken with him about the transaction. His deal with Díaz was all verbal. He meets him on the streets of San Juan and agrees at once to deliver him $45,000, to be repaid by a person whom he does not yet know. The next day he hands him the money, with no security except the private document which Díaz delivers to him. He stated that he had full confidence in Díaz, and did not learn of his financial embarrassment until after his death. Notwithstanding this, the letter itself speaks of moments decisive for Díaz.

No one knew of the deal between plaintiff and Díaz; no one knew of the delivery of the document. Only the witness, Miró, went to the house on the afternoon of March 23, 1929, and saw that plaintiff was delivering to an unknown man a large number of bills, and that there was a satchel on the table.

Perhaps a transaction such as the above may occur in real life, but it must be confessed that its singularity is striking. From its bare statements, without prejudice of any sort, the mind can not but doubt that a man would part with such a sum so easily and in such fashion.

And the doubt increases when the evidence presented by plaintiff himself to corroborate his testimony is examined, for the testimony of Camacho and of Vélez is so suspicious in itself as to heighten the uncertainty.

The meeting of defendant and Camacho in Caguas, the delivery of the letter to Díaz, the sending by Díaz to the defendant of an unsealed envelope containing the receipt which Camacho reads and memorizes so perfectly that he recites it time after time with all its details, as if he were reading it, all this is surprising, and the surprise grows as

the witness relates how plaintiff learned of this, and when Alvarez testifies later that he saw Don Benigno pass by his house every day, and that there was no need for his making use of another person in order to communicate with him.

The other meeting between Díaz and Vélez, whom he knew only slightly, and the errand on which he sent him early in April upon learning that he is coming to San Juan, an errand which makes it necessary for Vélez to leave the car in which he is travelling before reaching his destination and to enter a house to deliver not only a satchel, but also a message that there was a shortage of $300 in the hundred-dollar packages, all this is not only doubtful, it is unbelievable if one bears in mind plaintiff's own testimony with respect to his constant dealings with Díaz, and the use made by Díaz of Blas Delgado in connection with his business in San Juan.

What light is cast by the testimony of the handwriting experts? In the summary we made of this evidence we limited ourselves to transcribing the conclusions of the experts, and in our judgment the weight of this evidence is weakened by the very absence of any doubt which it reveals.

It will thus be seen that the plaintiff's evidence, taken alone, leaves on the mind of the judge an impression of strangeness, of uncertainty. And this impression grows and is strengthened upon analysis of the evidence of the defendant, to such an extent that no court of justice could feel itself justified in rendering a judgment in this case in favor of the plaintiff, even though the court could not honestly decide, in a categorical manner, whether or not the signature which appears at the foot of the document was placed there by the hand of defendant Isidoro Alvarez.

The testimony of the latter is clear, definite, logical even in those moments where he appears to waver, and is fully supported by the rest of his evidence.

He was in comfortable financial circumstances. His credit was solid. In March, 1929, upon his return to the Island

after having liquidated his business, his capital was invested in real property and mortgage loans, and he had a favorable balance in his bank account.

There is not a scintilla of evidence, aside from the questioned document, to show that he owed Díaz anything. He had satisfactory relations with Díaz, and small transactions. His attorney in fact testified that everything had been duly liquidated. Moreover, when in March, Díaz struggled desperately to obtain a loan of $30,000 and presented statements of his assets and liabilities to the banks, in none of them did he include any credit whatever in his favor and against the defendant. Besides, if defendant had been indebted to Díaz, would the latter not have demanded payment at that time, or would not he at least have made open use of the signature of Alvarez in order to obtain the desired loan, since Alvarez enjoyed such excellent credit in the banks? A business transaction involving $45,000 must necessarily leave some indelible track, yet nothing, absolutely nothing, was introduced in evidence in connection with the origin, motive, and development of such an important transaction.

It might be urged that Díaz collected his credit from defendant through the plaintiff. If so, what did he do with such a large sum? The evidence with respect to Díaz during this period reveals that he did not make a single cash deposit with the banks, or a single payment, that he continued in his efforts to obtain a loan of $30,000 and that he finally committed suicide because he could not meet his obligations.

There still remains the document, and defendant's expert evidence, contradicted in rebuttal by similar evidence introduced by plaintiff, tends to destroy it. In our judgment this expert evidence is not decisive, but it serves to enlighten the mind of the judge as to the possibility of the genuine signature of defendant's having been obtained, the original writing deleted, and what now appears on the document substituted. Along this line there is also the reference to defendant's incident with Félix Torres, and the insinuation as to the con-

nection of Torres with the plaintiff in the matter of the Jiménez promissory note.

The able attorney for the plaintiff makes an extraordinary effort in his brief to present defendant as a perjurer because in his testimony he insists on testifying that the signature appearing at the foot of the document is not his, whereas he himself referred to the Torres incident, and the theory of his defense admits that the signature is genuine.

We have analyzed this part of defendant's testimony, which is what we had in mind when, in referring generally to it, we said that it was "logical even in those moments where he appears to waver." When defendant, while being persistenly cross-examined, is confronted with the signature and the document, signature and document united, his statement that the signature is not his, when perhaps it was, is perfectly logical and congruent. What prevails before his conscience is the whole document, and since this is false, he denies the authenticity of the signature. The explanation which might be offered by his talented counsel is a hypothesis. The reality with which he is faced is that he could not have written that name because he never contracted that obligation. And he denies it. Who can be certain that he is not telling the truth?

The true theory of the defendant is to be found in his answer. The testimony of his expert chemist tends to offer the court an explanation in the event that the court should be convinced that the signature was authentic. Faced with the seriousness of the case, and with the various means that might be used to prepare it, defendant denies and at the same time explains, and the assertion which might be implicit in the explanation is not in conflict with the denial. The latter subsists, for it is always consistently maintained that the obligation sued on was never contracted and that the document, in one form or another, is not genuine.

By reason of all the foregoing, and since the facts, besides, speak for themselves, we consider that the trial court was

108

correct in its essential conclusion, which led it to render judgment for the defendant; and that therefore the appeal must be dismissed and the judgment appealed from affirmed.

Mr. Justice Córdova Dávila took no part in the decision of this case.